## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
## CHARLESTON DIVISION

| | | |
|---|---|---|
| **MARIA LYNN HOGUE,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 2:14-20820** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| **Defendant.** | ) | |

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Standing Order entered July 10, 2014 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 11 and 12.)

The Plaintiff, Maria Lynn Hogue (hereinafter referred to as "Claimant"), filed applications for DIB and SSI on September 28, 2010 (protective filing date), alleging disability as of October 3, 2008, due to bipolar, schizophrenia, and panic attacks.[1] (Tr. at 11, 148-70, 243.) The claims were denied initially and upon reconsideration. (Tr. at 68-72, 73-75, 78-80, 88-90, 92-94, 95-97, 99-101.) On September 9, 2011, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 102-04.) A hearing was held on January 25, 2013, before the Honorable Stanley Petraschuk.

---

[1] Claimant filed prior applications for DIB and SSI on July 27, 2009, alleging disability on January 15, 2009. (Tr. at 13.) Her claims were denied on September 15, 2009, and she did not pursue any appeal. (*Id.*)

(Tr. at 34-67.)  By decision dated February 22, 2013, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 11-28.) The ALJ's decision became the final decision of the Commissioner on May 10, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6.) Claimant filed the present action seeking judicial review of the administrative decision on July 8, 2014, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2013). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether

the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2013). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning;

concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

4

impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date, October 3, 2008. (Tr. at 13, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "bipolar disorder, anxiety disorder with panic, and personality disorder" which were severe impairments. (Tr. at 13, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 19, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform a full range of work at all exertional levels with limitations to learning and performing simple work activities. (Tr. at 21, Finding No. 5.) At step four, the ALJ found that Claimant could not return to her past relevant work. (Tr. at 26, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a bakery helper, laundry worker, and hand packer, all unskilled jobs. (Tr. at 27, Finding No. 10.) On this basis, benefits were denied. (Tr. at 27-28, Finding No. 11.)

5

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was born on May 2, 1951, and was 61 years old at the time of the administrative hearing, January 25, 2013. (Tr. at 26, 40, 159, 161.) The ALJ found that Claimant had a ninth grade, or limited education and was able to communicate in English. (Tr. at 26, 41, 242, 244.) In the past, she worked as a home care attendant or homemaker. (Tr. at 26, 64, 244, 257-64.)

 The Medical Record

The Court has considered all evidence of record, including the medical evidence and discusses it herein in relation to Claimant's arguments.

Charleston Internal Medicine:

On May 4, 2009, Claimant presented to Dr. Robert M. Eggleston, M.D., with reports of a three-week history of intermittent bleeding from her rectum and a follow-up of her mild bipolar disorder that had persisted for ten years. (Tr. at 310-12, 442-44.) Physical examination essentially was normal, with intact judgment and insight. (Tr. at 311-12, 443-44.) Dr. Eggleston diagnosed hemorrhoids; bipolar I disorder, single manic episode, mild; and GERD, well-controlled with medications. (Id.) He ordered a general surgery consultation with Dr. Lohan for hemorrhoids and prescribed medications. (Tr. at 312, 444.)

On November 3, 2009, Claimant reported abdominal pain of moderate severity, which was located in the epigastric region. (Tr. at 445.) Her abdomen was non-tender to palpation and she presented with normal bowel sounds. (Tr. at 446.) Dr. Eggleston diagnosed generalized abdominal pain and espophageal reflux, for which he ordered a urinalysis and blood tests and prescribed medication. (Id.) Claimant returned to Dr. Eggleston on December 17, 2009, with the same abdominal pain complaints. (Tr. at 451.) He recommended a general surgery consultation for hemorrhoids and prescribed medications. (Tr. at 452.)

Claimant presented to Dr. Eggleston on April 22, 2010, for evaluation of reflux with a several year history that was exacerbated by lying flat, eating, and spicy foods. (Tr. at 454.) Claimant also reported that she fell in October 2009, and that she had arm pain and numbness, leg pain, and left back pain. (Id.) Abdominal and musculoskeletal examinations were normal. (Tr. at 455-56.) Dr. Eggleston diagnosed esophageal reflux, rheumatoid arthritis, generalized anxiety disorder, osteoporosis, lumbago, and carpal tunnel syndrome ("CTS"). (Tr. at 456.) He ordered diagnostic studies, which essentially were normal. (Tr. at 456, 458-70.)

On November 4, 2010, Claimant presented with complaints of sore throat, ear pain and

7

discomfort, headache, and diffuse myalgias, with a three-week history. (Tr. at 471.) Claimant had a mouth full of blisters and an infected tooth. (Id.) Dr. Eggleston diagnosed common cold, depressive disorder, generalized anxiety disorder, osteoporosis, and an abscessed tooth and prescribed medication. (Tr. at 472.) Claimant returned on November 30, 2010, with similar complaints. (Tr. at 474.) She stated that her symptoms improved with medication but returned when she finished the medication. (Id.) Dr. Eggleston recommended a dental consultation. (Tr. at 476.) Chest x-rays on December 8, 2010, were normal. (Tr. at 477.) On January 6, 2011, Claimant again presented with complaints of headache, nasal congestion and discharge, dry cough, headache, and hoarseness. (Tr. at 478.) Dr. Eggleston prescribed medications. (Tr. at 479-80.)

Claimant returned to Dr. Eggleston on March 25, 2011, and reported that she was released from the hospital on February 5, 2011, for abdominal and chest pain. (Tr. at 486.) Claimant continued to have abdominal pain. (Id.) Dr. Eggleston assessed epigastric abdominal tenderness, ordered diagnostic testing, and prescribed medication. (Tr. at 487.) An ultrasound on April 6, 2011, was normal. (Tr. at 489.)

On August 30, 2011, Claimant presented with rheumatoid arthritis and continued abscessed tooth. (Tr. at 506.) Musculoskeletal examination was normal. (Tr. at 507.) Dr. Eggleston prescribed medication. (Tr. at 508.) Claimant returned to Dr. Eggleston on February 15, 2012, for evaluation of rheumatoid arthritis involving the bilateral hips, knees, neck and shoulders; osteoarthritis involving bilateral shoulder and neck aches; and fibromyalgia. (Tr. at 511, 592.) Claimant reported that she had been doing fairly well since the last visit, with the exception of anxiety related to the stressful care of her husband. (Id.) Dr. Eggleston diagnosed diffuse osteoarthritis, rheumatoid arthritis, and fibromyalgia. (Tr. at 512, 593.)

Claimant sought treatment on April 10, 2012, for complaints of left elbow pain and

worsening abdominal pain. (Tr. at 595.) She also reported right leg numbness and weakness. (Id.) Examination was unremarkable and Dr. Eggleston assessed idiopathic peripheral neuropathy and epigastric abdominal pain. (Tr. at 597.) He ordered diagnostic studies and prescribed medication. (Id.) On June 27, 2012, Claimant presented for follow-up from her recent hospital admission for right upper quadrant pain, nausea, and vomiting. (Tr. at 598.) Dr. Eggleston assessed irritable bowel syndrome and prescribed medication and directed her to return to the office if the diarrhea did not resolve or worsened. (Tr. at 600.)

On August 8, 2012, Claimant's main concern was long-term pain in multiple areas. (Tr. at 602.) She reported that she tolerated her medication without substantial side effects or interactions and that overall, her conditions had stabilized. (Id.) She also indicated that her gastrointestinal issues were resolving. (Id.) Examination essentially was normal and Dr. Peter G. Teichman, M.D., diagnosed essential hypertension and major depression, single episode. (Tr. at 605.) On August 22, 2012, Claimant complained of difficulty sleeping and urinary frequency. (Tr. at 607.) It was noted that Claimant adhered to the medication and treatment regimen and that she tolerated all medications without significant side effects or interactions. (Id.) The examination was unremarkable and Dr. Teichman assessed low back pain, sleep disorder, common cold, and dysuria. (Tr. at 610.) He noted Claimant's report that her depression was controlled. (Tr. at 611.)

On October 8, 2012, Claimant reported continued sleep disturbances. (Tr. at 612.) Dr. Teichman noted that her functional ability was within normal limits. (Id.) On December 7, 2012, Christina D. Britton, FNP, noted that Claimant's blood pressure was well controlled with medication, that her mixed lipid levels were poorly controlled with diet alone, that her mood and anxiety had worsened slightly in light of her brother's diagnosis of cancer, and that Claimant reported she was stable with medication. (Tr. at 615.) Ms. Britton advised Claimant to seek medical

attention urgently for new or worsening symptoms. (Tr. at 619.)

On January 7, 2013, Claimant underwent an annual wellness exam. (Tr. at 620-25.) Dr. Teichman noted that Claimant was undergoing treatment for depression, which was stable. (Tr. at 620.) Examination findings were normal. (Tr. at 623-24.)

Charleston Area Medical Center ("CAMC") Physical Therapy and Sports Medicine Center:

Claimant presented to CAMC Physical Therapy on November 24, 2008, for right knee pain following a work-related injury when she was assisting a patient who fell to one side. (Tr. at 571.) Plaintiff attempted to catch her patient with her leg and heard a pop in her right knee. (Id.) It was noted that Claimant ambulated with an antalgic gait pattern. (Id.) On December 11, 2008, Claimant denied catching of the knee but reported continued upper calf pain and left leg numbness. (Tr. at 569.) Examination revealed that Claimant limped on the right leg and tenderness of the fibular head. (Id.) There was no evidence of effusion, she had full range of knee motion, ligaments were stable, and there was an absence of joint line tenderness. (Id.) Dr. Michael O. Fidler, M.D., diagnosed sprained knee and contusion. (Id.) Dr. Fidler recommended that Claimant return to work with regular duties. (Tr. at 570.) He further noted that Claimant's condition was "self-limited" and did not require any interventions. (Id.) Dr. Fidler opined that physical therapy was not likely to make any difference given that it simply was a soreness that would gradually resolve. (Id.)

On February 25, 2009, Claimant was evaluated by N. Arthur Lilly, M.S., a rehabilitation coordinator, to determine her ability to perform the duties of a caregiver. (Tr. at 535-37.) Claimant presented in a knee brace on the right knee and reported that her pain was a level five on a scale of one to ten. (Tr. at 535.) She also reported that her right foot locked occasionally when she walked. (Id.) Mr. Lilly assessed that Claimant was capable of performing work at the sedentary exertional level. (Tr. at 536.) Specifically, he opined that Claimant could lift, carry, push, or pull ten pounds;

sit on a constant basis; perform reaching and handling functions on a frequent basis; and walk, stoop, climb stairs, kneel, reach overhead with the right arm, finger, feel, and stand on an occasional basis. (Tr. at 535, 537.) He further opined that Claimant could not crouch, climb ladders, or walk on uneven terrain. (Tr. at 536-37.) On exam, Mr. Lilly noted that Claimant had full range of right knee motion, which was better than her left uninvolved knee, and had no effusion, point tenderness, warmth, tenderness, clicking, or catch. (Tr. at 536.) Mr. Lilly recommended that Claimant attend a work conditioning program for four weeks. (Id.)

Alfredo C. Velazquez, M.D.:

Dr. Velazquez, a state agency medical physician, conducted a disability determination examination of Claimant on August 17, 2009. (Tr. at 314-19.) Claimant reported pain from her neck down to her feet for the past several years, for which she was taking Lamictal, Zalerina, Xanax, and Respiradol. (Tr. at 314.) She reported intermittent headaches and a hiatal hernia. (Tr. at 314-15.) Dr. Velazquez observed that Claimant was conscious, coherent, cooperative, and oriented. (Tr. at 315.) She exhibited reduced extension of the cervical spine and reduced lateral flexion of the lumbar spine, with pain. (Tr. at 315, 318.) Sensory and motor reflexes were normal, she was able to open and close her fingers, and upper extremity strength, grip strength, and fine manipulation were normal. (Tr. at 315, 317) She had no definitive tenderness in her lumbar area. (Tr. at 316.) Knee jerk and neurologic exam were normal. (Id.) Dr. Velazquez assessed hiatal hernia postoperative twice, pain in her right knee, and occasional pain in the lumbosacral area. (Id.)

Narendra Parikshak, M.D.:

On August 27, 2009, Dr. Parikshak, a state agency reviewing consultant, completed a form Physical RFC Assessment, on which he opined that Claimant's low back and right knee pain were non-severe impairments. (Tr. at 320-28.)

Lester Sargent, M.A.:

On September 3, 2009, Mr. Sargent, a state agency licensed psychologist, conducted a mental status examination on Claimant. (Tr. at 329-36.) Claimant reported that the primary reason she was unable to work was from complications of bipolar disorder and fibromyalgia. (Tr. at 330.) Mr. Sargent noted Claimant's reports of recurrent major depressive disorder and recurrent manic episodes that were consistent with bipolar disorder. (Id.) Claimant also reported a history of recurrent panic attacks and self-mutilating behaviors. (Id.) Mr. Sargent observed that she talked excessively, her mood ranged from sad to mildly elevated, her affect was mildly restricted to exaggerated intensity, thought processes were marked for circumstantialities, thought content was remarkable for suspiciousness, she had difficulty sustaining attention, and there was evidence of increased psychomotor agitation. (Id.)

Upon mental status examination, Claimant appeared casually dressed with proper hygiene, was adequately groomed and appeared her stated age, exhibited fair eye contact, had coherent and loquacious speech, was oriented, and exhibited moderately deficient judgment and mildly deficient insight. (Tr. at 332.) She denied any suicidal or homicidal ideation. (Id.) Claimant's immediate memory was normal, her recent memory was moderately deficient, and her remote memory was mildly deficient. (Id.) Mr. Sargent opined that Claimant's concentration and persistence were moderately deficient, her pace was mildly slow, and her social functioning during the evaluation was moderately deficient. (Id.)

Mr. Sargent diagnosed bipolar I disorder, most recent episode mixed, moderate, without psychotic features; panic disorder, without agoraphobia; and personality disorder NOS. (Tr. at 333.) He noted that Claimant went to the store and ran errands as needed, occasionally dined out, talked on the phone as required, maintained a checking account, and managed her finances. (Id.)

Additionally, Claimant reported that she performed all basic self-care duties without assistance, helped with the household chores for two hours at a time, watched television, tended to her pets, and prepared dinner. (Tr. at 333-34.) Mr. Sargent opined that Claimant's prognosis was poor but that she was capable of managing her funds. (Tr. at 334.)

Rosemary L. Smith, Psy.D.:

Dr. Smith completed a form Psychiatric Review Technique on October 13, 2009, on which she opined that Claimant's bipolar and panic disorders resulted in mild restriction of activities of daily living and difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Tr. at 339-53.) Dr. Smith noted that although Mr. Sargent opined that social functioning was moderately deficient, Claimant was cooperative and failed to allege any problems getting along with others. (Tr. at 351.) Additionally, Claimant reported talking to friends on the phone and occasionally visiting family members. (Id.) Dr. Smith, therefore, gave no weight to Mr. Sargent's opinion regarding social functioning. (Id.)

Dr. Smith also completed a form Mental RFC Assessment, on which she opined that Claimant was moderately deficient in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. at 354-55.) In all other mental functional categories, Dr. Smith opined that Claimant's abilities were not limited significantly. (Id.) Dr. Smith further opined that Claimant retained the "ability to learn and perform simple, unskilled work-like activities." (Tr. at 356.)

Prestera Center and Process Strategies Outpatient Clinic:

The record reflects Claimant's treatment at Prestera Center and Process Strategies from July

23, 2008, through March 30, 2011. (Tr. at 358-78, 582-91.) On July 23, 2008, Claimant reported increased anxiety related to personal and family stressors as well as increased financial problems. (Tr. at 377-78.) She was diagnosed with bipolar disorder, depression, and panic disorder, for which she was prescribed medication. (Tr. at 377.) Throughout her treatment, Claimant's mental status exams remained essentially normal, with minor fluctuations in mood and affect. (Tr. at 359, 361, 363, 365, 367, 369, 371, 374, 376, 378.) On November 12, 2008, Claimant reported minor mood fluctuations and that she had no full panic episodes. (Tr. at 375.) On March 11, 2009, Claimant again reported having experienced no panic episodes. (Tr. at 373.) Claimant reported on July 1, 2009, that she was depressed and had crying spells, as well as increased general anxiety. (Tr. at 372.)

Claimant underwent a mental evaluation on October 11, 2010, by William R. Hall, P.A. and Marilou Patalinjug Tyner, M.D. (Tr. at 589-91.) It was noted that Claimant had a history of chronic and mixed anxiety and depression and random panic episodes with features of agoraphobia, including persistent sleep disturbance, low energy and motivation, feelings of being tense and on edge, psychomotor restlessness, impaired concentration and memory, a sense of dread, and dysphoric mood. (Tr. at 589.) On examination, it was noted that Claimant manifested normal personal hygiene, maintained consistent eye contact, was pleasant and cooperative, had a restricted and mildly dysthymic affect, had normal speech, was well organized and goal directed, had normal psychomotor behavior, had fair insight and judgment, borderline-low average intelligence, and had unimpaired cognition and memory. (Tr. at 590.) She was diagnosed with major depressive disorder, recurrent, moderate; panic disorder; generalized anxiety disorder; rule out bipolar disorder; and assessed with a GAF of 55. (Tr. at 590-91.) Her medications were adjusted and it was recommended that she resume individual therapy. (Tr. at 591.)

On July 27, 2010, individual therapy progress notes indicated that Claimant was sleeping

relatively well, denied any panic episodes, was coping better with personal stressors, and therefore, had a decreased anxiety level. (Tr. at 580, 588.) On November 8, 2010, Claimant reported two anxiety attacks in one week, due to increased concern with finances, personal health, and the relationship with her spouse. (Tr. at 587.) On January 3 and February 1, 2011, Claimant reported an absence of panic episodes. (Tr. at 585-86.) Claimant's symptoms increased on March 2, 2011, and she reported erratic sleep, increased anxiety and panic symptoms, decreased concentration, auditory and visual hallucinations. (Tr. at 584.) However, she also reported that her use of marijuana was none of the therapist's business. (Id.) Her medications were adjusted on March 22 and 30, 2011. (Tr. at 582-83.)

Rogelio Lim, M.D.:

On November 30, 2010, Dr. Lim, a state agency medical source, completed a form Physical RFC Assessment, on which he opined that Claimant's pain from her neck to feet, hiatal hernias, GERD, and schizophrenia resulted in no functional limitations. (Tr. at 379-86.) Dr. Lim noted that Claimant's impairments were non-severe or slight. (Tr. at 386.) On August 23, 2011, Dr. A. Rafael Gomez, M.D., a state agency medical source reviewed the evidence of record and affirmed Dr. Lim's RFC assessment as written. (Tr. at 497.)

Kay Collins-Ballina, M.A. and Nina R. Lusk, M.A.:

Ms. Collins-Ballina, a state agency licensed psychologist, along with Ms. Lusk, conducted a mental status examination of Claimant on November 16, 2010. (Tr. at 388-93.) Claimant reported that she was applying for disability benefits because she no longer had "the head anymore to work with people. I used to love to work with people." (Tr. at 388.) She indicated that her panic attacks began after she was attacked with a knife in the parking lot at work. (Tr. at 388-89.) She reported a fair mood, up and down activity levels, sleep difficulties, crying episodes four times a month,

diminished interest in activities, racing thoughts, increased heart rate, difficulty breathing, and feeling as if the walls would come in on her. (Tr. at 389.) She further reported obsessive thoughts and passive suicidal ideations. (Id.) Claimant reported her activities to have included caring for her pets, cleaning the house, and making dinner. (Tr. at 390.) She indicated that she sometimes required assistance with washing herself. (Id.) Claimant reported that she no longer participated in social activities. (Tr. at 391.)

On mental status exam, Ms. Collins-Ballina noted that Claimant had fair hygiene with disheveled dress, exhibited relevant and coherent speech, was oriented, had a dysthymic mood and broad affect, normal thought process, an occasional hallucination, feelings of distrust of others, and normal psychomotor behavior, judgment, immediate and delayed memory, persistence, and pace. (Tr. at 391.) Claimant's insight was fair and her remote memory, attention, and concentration were mildly deficient. (Id.) Ms. Collins-Ballina diagnosed bipolar I disorder, most recent episode depressed, moderate and panic disorder without agoraphobia. (Id.) She noted that rapport was established easily and that Claimant interacted in a friendly, cooperative manner. (Tr. at 392.) She opined that Claimant's long-term prognosis was fair with treatment and intervention and that she was capable of managing her own benefits. (Id.)

Chester Frethiem, Psy.D.:

On December 28, 2010, Dr. Frethiem, a state agency psychologist, completed a form Psychiatric Review Technique, on which he opined that Claimant's bipolar and panic disorders were non-severe impairments that resulted in mild restrictions of activities of daily living; mild difficulties in maintaining social functioning, concentration, persistence, or pace; and no episodes of decompensation of extended duration. (Tr. at 394-407.) He opined that there was "no evidence of significant functional limitations associated with her mental health problems." (Tr. at 406.) On

August 23, 2011, Dr. Jeff L. Harlow, M.D., reviewed the evidence of record and noted that there was an absence of any change in mental condition, new mental limitations, or changes in daily activities since Dr. Frethiem's assessment. (Tr. at 499.) Dr. Harlow, therefore, affirmed Dr. Frethiem's assessment. (Id.)

CAMC Emergency Room:

Claimant presented to the ER on November 13, 2008, with complaints of right leg pain. (Tr. at 428-29.) Claimant reported that she injured her leg on October 31, 2008, when she placed her right leg behind her patient to prevent her from falling. (Tr. at 428.) Since then, Claimant reported that she had experienced hip and knee pain, with swelling that caused pain down her right calf. (Id.) She also reported left leg numbness following the incident. (Id.) On exam, Claimant had full range of right hip motion and pain with flexion and extension of her knee. (Tr. at 429.) She had some pain behind her knee and range of motion in her right ankle and left leg was normal. (Id.) The x-rays of her right hip and knee were normal. (Tr. at 429-31.) Dr. John S. Bodkin, D.O., diagnosed right knee pain and right hip pain, status post trauma, and prescribed limited ambulation, ice, and Ultram for pain, as needed. (Tr. at 429.)

On March 5, 2011, Claimant sought treatment for chest pain, pressure, swelling, and abdominal pain. (Tr. at 411-12, 425-26.) On examination, it was determined that Claimant's pain was in her left chest wall inferiorly as opposed to her abdomen. (Tr. at 411.) She described the pain as dull in nature that at times radiated to her arm or jaw. (Id.) Claimant was admitted for cardiac work-up and evaluation. (Tr. at 411, 413, 415-16.) CT scans of the abdomen and pelvis revealed no acute process, chest x-rays and cardiac enzymes were negative, an EKG revealed normal sinus rhythm, and a stress test revealed no evidence of stress-induced ischemia and the ejection fraction was well preserved. (Tr. at 426.) Claimant was discharged home in stable condition with instructions

17

to perform activity as tolerated and follow a cardiac diet, and to follow-up with her primary care physician. (Id.)

Claimant presented with right upper quadrant pain with a several year history on June 5, 2012. (Tr. at 515-16.) She reported significant nausea and vomiting and very loose stool. (Tr. at 515.) On exam, Claimant had tenderness to palpation in the right upper quadrant at the bottom of the right rib cage. (Tr. at 516.) She had positive Murphy's sign, decreased bowel sounds, and mild epigastric discomfort. (Id.) She was admitted for further work-up. (Id.) Results of the HIDA scan were normal, an EGD revealed essentially only gastritis-type findings, and the x-ray and ultrasound results were normal. (Tr. at 523, 525, 531-32, 533-34.) She was discharged on June 8, 2012, with prescriptions for Omeprazole, Levaquin, and Bentyl. (Tr. at 523.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in assessing her RFC. (Document No. 11 at 6-7.) Claimant notes that the ALJ gave great weight to the opinion of a State agency psychologist, Dr. Smith, regarding moderate limitations in maintaining attention and concentration, performing activities within a schedule, maintaining regular attendance, and being punctual. (Id. at 6.) She asserts, however, that the ALJ's findings and the weight given to Dr. Smith conflict with the actual RFC assessed by the ALJ, which only limited her in learning and performing simple work activities. (Id.) Claimant further asserts that the "ALJ's omission of limitations from his controlling hypothetical question and his RFC to account for all of the severe impairments that he found, based on the opinion of State agency psychologists, was reversible error." (Id. at 7.)

In response, the Commissioner asserts that the ALJ's RFC accounts for all of Claimant's credibly-established limitations. (Document No. 12 at 11-14.) The Commissioner asserts that in

18

December 2008, Dr. Fidler encouraged Claimant to return to work and indicated that physical therapy would not make any difference for the soreness eventually would resolve. (<u>Id.</u> at 11-12.) Upon consultative examination in August 2009, exam findings essentially were normal. (<u>Id.</u> at 12.) By August 2012, Claimant's chronic pain, fibromyalgia, and anxiety had resolved. (<u>Id.</u>) Regarding her mental conditions, the Commissioner asserts that the evidence demonstrated that her impairments were controlled with medication and that mental status exams essentially were within normal limits. (<u>Id.</u> at 12-13.) The Commissioner further asserts that Claimant's activities supported the ALJ's RFC assessment. (<u>Id.</u> at 13.) Though Claimant attacks the ALJ's hypothetical questions, the Commissioner asserts that he properly included all of Claimant's credibly-established limitations. (<u>Id.</u>) The Commissioner contends that the ALJ's RFC findings adequately convey Claimant's limitations. (<u>Id.</u>)

Claimant next alleges that the ALJ's decision is not supported by substantial evidence because the ALJ erred in failing to give any weight to the opinion of Claimant's physical therapist. (Document No. 11 at 7-9.) Claimant asserts that pursuant to 20 C.F.R. §§ 404.1513(d) and 416.913(d), the ALJ is required to consider evidence from other sources to determine the severity of the impairment and how it affects the claimant's ability to work. (<u>Id.</u> at 7.) She states that Mr. Lilly was a certified athletic trainer, to whom she was referred by her primary care physician, for a functional capacity evaluation. (<u>Id.</u> at 7-8.) Claimant further asserts that the ALJ incorrectly concluded that Mr. Lilly's opinion was based on Claimant's subjective report. (<u>Id.</u> at 8-9.) Claimant states that Mr. Lilly's opinion was based on his functional capacity assessment, which was then compared to corresponding job demands. (<u>Id.</u>) Thus, the ALJ's failure to give any weight to Mr. Lilly's opinion was not harmless error given the sedentary level of exertion he assessed and under

19

Medical-Vocational Rule 201.02, that would result in a finding of disability given Claimant's age, education, and experience. (Id. at 9.)

In response, the Commissioner asserts that substantial evidence supports the ALJ's determination that Mr. Lilly's opinion was entitled no weight because the opinion was inconsistent with the overall evidence. (Document No. 12 at 14-16.) The Commissioner notes that the Regulations permit, but do not require the ALJ to use evidence from other sources regarding the severity of a claimant's impairment and how it affects the claimant's ability to work. (Id. at 14.) Rather, opinions from other sources may be considered depending on the facts of each case. (Id.) The Commissioner asserts that the overall physical findings in this case were normal; Dr. Fidler recommended in December 2008, that Claimant return to work and that her condition was self-limiting and that physical therapy would not help; and an annual examination on January 7, 2013, revealed normal physical and neurological findings. (Id. at 15-16.) The Commissioner also asserts that Claimant alleged she was unable to work due to mental impairments as opposed to physical impairments. (Id. at 16.) Thus, the overall medical evidence is inconsistent with Dr. Lilly's opinion, and therefore, the ALJ properly assigned his opinion no weight. (Id.)

Finally, Claimant alleges that the ALJ's decision is not supported by substantial evidence because the ALJ erred in evaluating Claimant's credibility, particularly in light of her multiple severe mental impairments. (Document No. 11 at 9-11.) Claimant asserts that the ALJ failed to contemplate or weigh any of the factors set forth in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3), or comply with the requirements of SSR 96-7p, in determining her credibility. (Id. at 10-11.) She states that the ALJ only considered medication treatment and opinion evidence from select medical experts. (Id.)

20

In response, the Commissioner asserts that the objective medical evidence of record did not support Claimant's subjective complaints. (Document No. 12 at 16-17.) Contrary to Claimant's allegation, the Commissioner asserts that the ALJ properly weighed the evidence in accordance with the Regulations to determine her credibility and extensively discussed evidence that related to her allegations of disabling symptoms. (Id. at 17.) The Commissioner asserts that the evidence established that Claimant's mental impairments were controlled with medication that she tolerated without substantial side effects and that she had overall normal physical findings. (Id.) Thus, the Commissioner contends that Claimant's argument as to the ALJ's credibility assessment is without merit. (Id.)

Analysis.

1. RFC Assessment.

Claimant first alleges that the ALJ erred in assessing her RFC. (Document No. 11 at 6-7.) The Commissioner contends that the ALJ's RFC accounts for all of Claimant's credibly-established limitations. (Document No. 12 at 11-14.) "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2013). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's

residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

In Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015), the Fourth Circuit observed that SSR 96-8p "explains how adjudicators should assess residual functional capacity. The Ruling instructs that the residual functional capacity 'assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions' listed in the regulations." It is only after the function-by-function analysis has been completed that RFC may "be expressed in terms of the exertional levels of work." Id. The Court noted that the ruling must include a narrative as to how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. Id. The Fourth Circuit further noted that a per se rule requiring function-by-function analysis was inappropriate "given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or uncontested." Id. Rather, the Fourth Circuit adopted the Second Circuit's approach that "remand may be appropriate...where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id. (*Citing* Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)); see also, Ashby v. Colvin, Civil Action No. 2:14-674 (S.D. W.Va. Mar. 31, 2015).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2) (2013).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2013). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an

individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

Claimant's challenge to the ALJ's RFC assessment rests solely upon her mental impairments. She acknowledges the ALJ's finding that she was limited moderately in her ability to maintain concentration, persistence, or pace. (Document No. 11 at 6; Tr. at 20.) She also acknowledges the ALJ's assignment of great weight to Dr. Smith's opinion that she was limited moderately in her ability to maintain attention and concentration, perform activities within a schedule, maintain regular attendance, and be punctual within customary guidelines. (Document No. 11 at 6; Tr. at 25.) The ALJ however, in his hypothetical questions to the VE failed to include any specific limitations assessed by Dr. Smith or those limitations in concentration, persistence, or pace as assessed by the ALJ. (Tr. at 64-66.) Rather, the ALJ's hypothetical questions only indicated a limitation to learning and performing simple, unskilled work-like activities. (Id.) Claimant alleges that the ALJ's mental RFC assessment, which contained the sole limitations that she was "limited to learning and performing simple work activities," does not account for the moderate limitations in maintaining concentration, persistence, or pace, and the moderate limitations assessed by Dr. Smith. (Document No. 11 at 6-7.) She cites to cases arising out of the third and sixth circuits in support of her argument. The Fourth Circuit has held that an "ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine

24

tasks or unskilled work.'" <u>Mascio</u>, 780 F.3d at 638. Here, apparently in an effort to accommodate for deficiencies in concentration, persistence, or pace, the ALJ included in his hypothetical questions, limitations to performing simple, unskilled work-like activities. (Tr. at 64-66.) Thus, the ALJ adequately considered Claimant's ability to perform simple tasks, but did not consider her ability to stay on task. Accordingly, the undersigned finds that remand is necessary for the ALJ to determine whether significant jobs exist in light of Claimant's limited ability to stay on task.

2. <u>Physical Therapist's Opinion</u>.

Claimant also alleges that the ALJ erred in failing to give controlling weight to her treating physical therapist's opinion. (Document No. 11 at 7-9.) The Commissioner contends that Mr. Lilly's opinion was entitled no weight because it was inconsistent with the overall evidence of record. (Document No. 12 at 4-6.) Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2011). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." <u>Id.</u> §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and

416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency medical or psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2011). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2011). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2011). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2011). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted

above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

The ALJ properly accorded no significant weight to Mr. Lilly's opinions because he was not an acceptable medical source, and therefore, his opinions were not entitled to receive controlling weight as would a treating medical source. See 20 C.F.R. §§ 404.1513(a) and (d)(1) and 416.913(a) and (d)(1). Despite having not been an acceptable medical source, the ALJ considered Mr. Lilly's opinion and concluded that his opinion was not entitled weight because it was based on a one-time examination of Claimant and relied on Claimant's subjective reports. (Tr. at 24.) Additionally, diagnostic testing revealed essentially normal findings. Dr. Fidler encouraged Claimant to return to work in December 2008, and indicated that Claimant's condition was self-limited and did not require further intervention. (Tr. at 570.) He also concluded therefore, that physical therapy would not make any difference given that Claimant's soreness eventually would resolve. (Id.) Thus, the other objective evidence of record also discredited Mr. Lilly's opinions. The ALJ further noted that when Claimant filed her applications, she failed even to allege any physical condition as a disabling impairment. (Tr. at 24.) Accordingly, in view of the foregoing, the undersigned finds that the ALJ's decision to accord no weight to the opinion of Mr. Lilly is supported by the substantial evidence of record.

3. Pain and Credibility.

Claimant finally alleges that the ALJ erred in assessing her credibility. (Document No. 11 at 9-11.) The Commissioner contends that the ALJ properly weighed the evidence as it related to Claimant's allegations of disabling symptoms and concluded that she was not entirely credible. (Document No. 12 at 16-17.) A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged. 20 C.F.R. §§ 404.1529(b) and 416.929(b) (2012); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). If such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent to which they affect a claimant's ability to work must be evaluated. Id. at 595. When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2013). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . . Factors relevant to your symptoms, such as pain, which we will consider include:

> (i) Your daily activities;

28

(ii) The location, duration, frequency, and intensity of your pain or other symptoms.

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2013).

SSR 96-7p repeats the two-step regulatory provisions:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the

"type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the Regulations.  A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless, Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing pain, symptoms, and credibility. (Tr. at 21-22.) The ALJ found at the first step of the analysis that Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. at 22.) Thus, the ALJ made an adequate threshold finding and proceeded to consider

30

the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 22-26.) At the second step of the analysis, the ALJ concluded that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible for the reasons explained in this decision." (Tr. at 22.)

Claimant first asserts that the ALJ erred in assessing her credibility in light of her mental impairments. (Document No. 11 at 9-11.) The ALJ summarized the evidence as it pertained to Claimant's mental impairments, including Mr. Sargent's evaluation, treatment notes from Prestera Center and Process Strategies, and the examination by Ms. Collins-Ballina. (Tr. at 22-23.) Based on this evidence, the ALJ concluded that Claimant had no more than moderate limitations in the areas of concentration, persistence, or pace. (Tr. at 23.) The ALJ did not adopt Ms. Collins-Ballina's assessment of moderate limitations in social functioning because the evidence established that she was cooperative, maintained good eye contact, and exhibited good communication. (Id.) Claimant also testified that she did not have any problems getting along with supervisors or the public. (Id.) Claimant further testified that she no longer received mental health treatment and never had been hospitalized on an inpatient basis for her alleged mental impairments. (Id.) Thus, the ALJ properly considered the nature of Claimant's mental impairments, treatment, and associated factors. The ALJ found that Claimant's treatment was conservative in nature, which was inconsistent with Claimant's allegations. (Tr. at 23-24.)

The ALJ acknowledged that Claimant failed to report any side effects from any medication. (Tr. at 24.) The ALJ then proceeded to consider Claimant's reported daily activities, which were not limited to the extent one would expect, given Claimant's disabling symptoms. (Id.) Finally, the ALJ considered the opinion evidence as it pertained to Claimant's mental impairments. (Tr. at 25-26.) Accordingly, in view of the foregoing, the undersigned finds that the ALJ properly considered the

31

factors set forth in the Regulations in assessing Claimant's credibility and that the ALJ's decision is supported by substantial evidence. Although Claimant does not take issue with the ALJ's assessment of her credibility as it pertains to her physical impairments, the undersigned finds that the ALJ engaged in the same analysis and that his decision is supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **GRANT** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 11.), **DENY** the Defendant's Motion for Judgment on the Pleadings (Document No. 12.), **REVERSE** the final decision of the Commissioner, **REMAND** this matter pursuant to sentence four of 42 U.S.C. 405(g) for further administrative proceedings to re-evaluate Claimant's moderate limitations in concentration, persistence, or pace and whether such limitations allow her to perform jobs that exist in significant numbers, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.

Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: August 31, 2015.

R. Clarke VanDervort
United States Magistrate Judge